### APPEAL OF THE SHIPOWNERS & MERCHANTS TUGBOAT CO.

Docket No. 3955.   Decided July 27, 1926.

1. In a general plan for the acquisition of the property of a corporation, a group of individuals first bought the stock. A new corporation was then organized with the same stockholders and acquired the property of the old corporation in exchange for its stock. *Held,* a case within section 331, Revenue Act of 1918, and such property included in new corporation's invested capital at same figure as applied to old corporation.

2. A corporation's invested capital is not affected by a change of ownership of its stock.

*William M. Williams, Esq.,* and *E. B. Quiggle, Esq.,* for the petitioner.

*George G. Witter, Esq.,* for the Commissioner.

Before STERNHAGEN, LANSDON, and ARUNDELL.

Proceedings to set aside a determination of deficiency of $25,744.49 income and profits tax for 1920, alleging that (1) section 331, Revenue Act of 1918, is not applicable, (2) no gain was derived from the sale of tugboat *Hercules,* and (3) deduction for amortization should be allowed although not heretofore claimed.

#### FINDINGS OF FACT.

In the year 1918 and prior thereto, Shipowners & Merchants Tugboat Co. (hereinafter referred to as the old company), was a corporation engaged in the business of owning and operating a fleet of tugboats in and around the Bay of San Francisco.

During the early part of the year 1918, about March or April, one of the directors of the old company approached one Tynan, representing the Bethlehem Shipbuilding Co., with the view of selling the fleet of sixteen tugboats then owned by the company. Tynan then made up a syndicate or group of individuals, including Thomas Crowley and his associates, (said group being hereinafter referred to as the buyers), to purchase the tugboats, and the negotiations for such purchase were continued. The old company offered to sell the

sixteen tugboats to the buyers for an aggregate of $1,020,000, made up of a certain price for each tugboat, together with some equipment for a further sum of $21,000. The tugboat *Hercules* was included in said offer at the price of $300,000.

The parties first thought of selling and buying the tugs directly, but this was changed into an arrangement for the purchase of the stock of the old company.

At the time of said negotiations the old company had outstanding 4,285 shares of stock. The stockholders were numerous and scattered. The majority of the stock was owned by persons residing in or near San Francisco, but some was owned by persons in the eastern part of the United States and some by persons residing in England.

On May 15, 1918, a written agreement was entered into between W. J. Gray, J. D. and A. B. Spreckels Securities Co., F. S. Samuels, Arthur Page, W. H. Marston, C. Randall, John W. Curry, stockholders of the old company, and all other stockholders of the old company who may execute the agreement, as first parties, Shipowners & Merchants Tugboat Company (the old company), second party, and Robert J. McGahie, third party, representing the buyers. The agreement was prepared with many counterparts which were sent for execution to the various stockholders of the old company whose signatures were not affixed to the original copy. The agreement provided in its essential respects as follows:

(1) That the old company should form a California corporation (hereinafter referred to as the Securities Company) which would (a) take over all of the assets of the old company except the sixteen tugboats above mentioned, its office furniture, fixtures, telephone and office equipment, and all its rights to its office building and in or to the occupancy or use of the dock then used for its office and vessels, (b) assume all the liabilities of the old company arising prior to May 1, 1918, subject to certain limitations and exceptions not material to this case, and (c) issue to the old company in exchange for said assets such amount of the capital stock of the Securities Company as might be agreed upon between the two companies.

(2) That the old company should then distribute to its stockholders the said stock of the Securities Company.

(3) That the stockholders of the old company who were the first parties to the agreement should sell to the third party, representing the buyers, the stock of the old company at the price of $899,850 for the entire 4,285 shares outstanding, or at the rate of $210 per share, said price to be paid as follows: (a) as to each stockholder who shall sign the agreement and deposit his stock in escrow, as provided therein, prior to July 1, 1918, the sum of $116 on the deposit of the stock in escrow, less such sum as the stockholder might have received out of the initial payment of $100,000 to the escrow holder, or $94 per share, on or prior to July 1, 1918, and (b) as to each stockholder who signed the agreement and deposited his stock in escrow subsequent to July 1, 1918, but within the time limited in the agreement, the full amount of $210 per share upon such deposit of the stock.

(4) That the stockholders of the old company, who are parties to the agreement, should deposit their certificates of stock in that company, endorsed in

blank, with the Bank of California National Association as escrow holder, and the buyers should pay to said bank the purchase price, which should then be paid over by the bank to the stockholder entitled thereto; but that no stock was to be deposited prior to the formation of the Securities Company and the distribution of its stock to the stockholders of the old company.

(5) That the buyers should make an initial payment to the escrow holder of $100,000 on account of the purchase price of the stock, immediately upon execution of the agreement by stockholders of the old company holding of record at least 2,857 shares of its stock, said $100,000 to be paid by the escrow holder to the stockholders depositing said stock in proportion to their respective interests.

(6) That none of the stock of the old company was to be delivered to the buyers before July 1, 1918.

(7) That all earnings from the said tugboats between May 1, 1918, and July 1, 1918, should be used solely for the payment of expenses of their operation on and after May 1, 1918, and were not to be distributed as dividends prior to July 1, 1918, but all dividends declared and paid after July 1, 1918, out of earnings derived from said tugboats on and after May 1, 1918, should belong to the buyers.

(8) That any stockholder of the old company might execute the agreement within three months from its due date and become a party thereto.

Pursuant to said agreement the Securities Company was organized and the assets of the old company, other than the tugboats and furniture and fixtures, were transferred to the Securities Company in exchange for its stock, which was then distributed pro rata to the stockholders of the old company.

From time to time thereafter stock of the old company was deposited with the escrow holder, but there was delay in getting the agreement executed by some of the stockholders and the stock was not all deposited with the escrow holder until at least the latter part of the year 1918, but prior to January 10, 1919.

From the beginning of the negotiations for the purchase of the tugboats of the old company it was contemplated that a new corporation would be formed to take over and operate said tugboats, and at the time the agreement of May 15, 1918, was entered into it was agreed among the members of the syndicate who composed the buyers that, as soon as the stock of the old company was acquired, the boats and property of said company would immediately be turned over to a new company to be thereafter organized by said syndicate and to be known as The Shipowners & Merchants Tugboat Co.

On or about July 1, 1918, the directors of the old company resigned and a new board was elected, consisting of certain members of the syndicate of buyers to each of whom had been transferred from the stockholders of the old company 10 shares of its stock as qualifying shares; Thomas Crowley, one of the buyers, was chosen as its general manager and took charge of the operation of the tugboats. No other transfers of stock of the old company were made to the buyers or their representative until January 10, 1919, as hereinafter stated.

On July 20, 1918, the buyers organized The Shipowners & Merchants Tugboat Co., the taxpayer in this appeal, under the laws of the State of California, with an authorized capital stock of the par value of $1,500,000, consisting of 15,000 shares of a par value of $100 each.

On January 10, 1919, after all of the outstanding stock of the old company had been deposited with the escrow holder, the certificates endorsed in blank representing 4,195 shares of that stock (the remaining 90 shares having been transferred to the new board of directors as qualifying shares) were turned over to Robert J. McGahie as the representative of the buyers. On the same day McGahie surrendered said certificates to the old company and there was issued to him as the representative of the buyers one new certificate, No. 516, for 4,195 shares of stock of said company. There was attached to said certificate a bill of sale, signed by McGahie, purporting to assign, transfer and set over to the buyers the said shares of stock. The same day said certificate No. 516, to which said bill of sale was attached, was canceled. New certificates of stock of the old company were written out in the names of the buyers according to their respective interests and executed but were never detached from the stubs in the stock certificate book. These certificates were then endorsed by rubber stamp as follows:

On the 10th day of January, 1919, substantially all of the capital assets of this company were distributed to its stockholders, pursuant to authority and permission granted by the Commissioner of Corporations, and the value of the shares represented by this certificate was reduced accordingly.

On the same day, January 10, 1919, the old company transferred, as of September 30, 1918, all of its assets, including its tugboats and its profits earned after May 15, 1918, to the taxpayer, The Shipowners & Merchants Tugboat Co. On the same day, January 10, 1919, the taxpayer, in exchange for said assets, issued to the old company 10,000 shares of the stock of the taxpayer, of a par value of $1,000,000, less the qualifying shares that had previously been issued to its directors. Said stock was then distributed to the buyers.

Only a small percentage, and less than 50 per centum, of the stock of the taxpayer was issued to persons who were stockholders of the old company during the negotiations for the purchase of the tugboats and at the time the agreement of May 15, 1918, was entered into.

The delay in completing the transaction after the incorporation of the taxpayer on July 20, 1918, was due to the time that was required to get all of the stock of the old company into the hands of the escrow holder, and to obtain a permit to issue the stock of the taxpayer from the Capital Stock Issues Committee in Washington and there-

after obtain a permit from the Commissioner of Corporations of the State of California.

In addition to the amount of $899,850 paid by the buyers for all of the stock of the old company, there were certain additional obligations and expenses of the old company assumed by them, in the amount of $100,150, making a total of $1,000,000 so invested by them.

The property received by the taxpayer in exchange for its stock on January 10, 1919, was worth $1,000,000.

The taxpayer claimed an invested capital of $1,041,689.86 for the year 1920. The Commissioner reduced its invested capital for that year to $530,866.47 by limiting the amount that it could include on account of the tugboats and other items transferred to it for its capital stock of the par value of $1,000,000, to the amount allowable as invested capital to the old company on account of said property.

Under date of November 19, 1918, the old company, Shipowners & Merchants Tugboat Co., entered into a written agreement with James Rolph, of San Francisco, for the sale by the former to the latter of the tugboat *Hercules* for the sum of $300,000. This agreement superseded a preliminary memorandum of agreement dated June 7, 1918, between the old company and Rolph Navigation & Coal Co., James Rolph's corporation, for the sale of the *Hercules* for the sum of $310,000.

Said agreement of November 19, 1918, provided for the immediate delivery of the possession of the tugboat to the purchaser, and for the payment by him to the old company, on account of the purchase price of the tugboat, of $50,000 on execution of the agreement, $60,000 on January 15, 1919, $50,000 on July 1, 1919, and $140,000 on January 15, 1920, together with interest on all deferred payments at the rate of 6 per cent per annum until paid. Title to the tugboat was to remain in the vendor until all payments were made, when a bill of sale thereof was to be given to the vendee by the vendor.

The tugboat *Hercules* was carried on the books of the old company at $197,946.74. When the taxpayer opened its books of account as of September 30, 1918, it included the *Hercules* at the same figure, namely, $197,946.74, at which it had been carried on the books of the old company. In making out its Federal income and profits-tax return for the year 1920, the taxpayer reported a taxable gain for that year from the sale of the *Hercules* of $48,127.79, arising from the receipt of the final payment of $140,000 under the said sales agreement of November 19, 1918. The amount thus reported as taxable gain was arrived at by treating the transaction as an installment sale on the basis of a cost of the tugboat to the taxpayer of $197,946.74, less depreciation of $1,077.73, or a net amount of $196,869.01.

Throughout the year 1918 and in the early part of 1919 the tugboat *Hercules* had a value of not less than $300,000. In the offer

for the sale of its tugboats by the old company during the early part of the year 1918, which was tentatively agreed upon, as above stated, the *Hercules* was included at the price of $300,000, and the purchase price of the stock of the old company, after its assets other than the tugboats and furniture and fixtures were eliminated, reflected a like value for the *Hercules*.

The tugboats acquired by the taxpayer were partly ocean-going tugs and partly harbor tugs. The ocean-going tugs were engaged in towing oil barges between Port San Luis and San Francisco, which were bringing in oil principally for the use of the Shipping Board vessels and Navy vessels. The harbor tugs were engaged principally in shifting destroyers and submarines at the Bethlehem Shipbuilding plant, in handling new ships under construction for the Shipping Board at the different shipyards in San Francisco, and in shifting Navy barges and Navy vessels and docking Army transports. Said tugboats suffered a substantial decline in market value between the time of their acquisition by the taxpayer and December 31, 1920, and a still further decline as of March 3, 1924.

The taxpayer now claims an allowance for amortizaton of its tugboats as a deduction for the year 1920. No claim for amortization was filed by it prior to June 15, 1924.

OPINION.

STERNHAGEN: The petitioner claims that its tugs were paid in for stock or shares and that they had at such time an actual cash value of $1,000,000, and hence, under section 326 of the Revenue Act of 1918, this amount is included in its statutory invested capital. The Commissioner asserts that, however this may be, the situation is within section 331, whereby the petitioner's invested capital is limited as to the tugs by the amount allowable to the old corporation. The petitioner insists that section 331 is not applicable because this case is not within its letter or intendment.

The plan of the war and excess-profits tax is to impose such tax upon the income above an established return on the statutory invested capital. In the ordinary case invested capital consists of the factors enumerated in section 326. But section 331 was obviously included in the plan in order to prevent a taxpayer from inflating its statutory invested capital and thus, by including appreciated values not otherwise recognizable, *La Belle Iron Works* v. *United States*, 256 U. S. 377, reducing the ratio by which its tax was measured. With no apparent departure from the accepted doctrine that corporate entities were separate from their stockholders, it was recognized that corporate action may be so guided by stockholders that legal ownership may be changed and the measure of tax lia-

bility contemplated by the statute defeated. In such a situation the statute provides by section 331 that the corporation as reorganized or otherwise changed shall have as its invested capital not the normal items set forth in section 326 but instead the items which would have existed if the change had not been brought about. By classifying such corporation for taxation upon the measure of its predecessor, the possibility of avoiding the intended tax was effectually frustrated. This was a method whereby differences brought about as we have described should be ignored so that the tax should apply equally to those within the general plan of taxation.

To accomplish this, general language had to be employed so as to embrace all cases. The fact that it might embrace an isolated case so peculiar in its facts as not to be within the class normally intended to be covered is an effect common to taxing statutes, and if it requires a remedy it is not by way of strained construction but of legislation. This Board is charged to apply the statute as it finds it, and to assume that Congress intended it to embrace all cases within the ordinary meaning of the language used.

It is not doubted that the old corporation's invested capital would have included only such amount for tugboats as the Commissioner has allowed. That this remained unaffected by the price which any individual stockholder may have paid for his stock is indubitable. Appreciation of corporate assets usually is reflected in the price of stock while it may not appear in invested capital. *La Belle Iron Works* v. *United States, supra.*

Passing to the present corporation, it is not disputed that the tugs and other assets were on January 10, 1919, worth $1,000,000 and paid in for stock or shares. Looking to section 326 alone this would be included in its invested capital from that time forth, for it could hardly be said that, while the old corporation still owned the tugs and included them in its invested capital, the new corporation was also entitled to be regarded as their owner. True, negotiations and arrangements were in progress toward their acquisition by the new company and to that end stock of the old corporation was going into escrow. But we have seen that this does not affect invested capital. From early in 1918 there was a steadily changing ownership of stock, that is, the property of the individual shareholder, but no change in the ownership of the trade or business or the property of the old corporation and no change in its tax status under this statute. Section 331 was of no concern at that time.

It was only when the new corporation came into existence and its problem of invested capital arose that it was concerned with the ownership and value of the tugboats. It then for the first time became important to consider whether there was a "reorganization,

consolidation, or change of ownership of a trade or business, or change of ownership of property." Whether this is a reorganization within the meaning of the Act is not readily answered, for the word is not defined in the Act nor are its inclusions set forth as they subsequently were in the Revenue Act of 1921, section 202 (c) (2). It may be doubted whether it is to be confined to a narrow significance of corporate reorganization. There is little indication that a consolidation took place, except the sketchy testimony of Crowley that the plan was to include the boats of his old company.

It seems clear, however, that on January 10, 1919, there was a change of ownership of the trade or business of operating the tugs for profit. Up to this point the old corporation was the owner, operating, it is true, through the management of Crowley but by virtue of its own appointment and at its own responsibility. And there was also on that date a change of property in the tugboats. But we can find no change of ownership before that date, and any attempt of the Government to determine a gain or loss or otherwise impose a tax predicated upon a change of ownership would certainly have been unjustified. Mind, it is not a change of interest or control which is the first consideration, but a change of ownership, and this occurs at a time and not vaguely over a period.

Having determined the time as January 10, 1919, we are then to say whether after this change of ownership "an interest or control in such trade or business or property of 50 per centum or more remains in the same persons, or any of them." From the findings—all of which are substantially as requested by petitioner's counsel—it appears that from time to time after May 15, 1918, the stockholders of the old corporation deposited their stock in escrow under the agreement. Apparently the holders of 2,857 shares deposited their stock early and received their pro rata share of the $100,000 deposited by the buyers. On January 10, 1919, the stock of the old corporation was issued to McGahie, while the old corporation was still owner of the boats. Thus we have a clear fact, immutable before the law, that before the change of ownership of the trade or business or property McGahie had substantially more than a 50 per cent interest or control, not for himself but as the representative of the buyers. Shortly thereafter the ownership was formally transferred to the new corporation, whose stock therefor was issued to the old corporation, and thereupon the old corporation distributed this stock to the same persons who already had a greater than 50 per cent interest. Thus the situation is brought squarely within section 331.

Against these definite facts, each of which was established by these participants deliberately and for their own purpose, we are not at liberty to place an equitable construction to effectuate the alleged broader taxing purpose of Congress. It appears to be quite true that

these stockholders have an aggregate investment in their corporation's business of $1,000,000 and that their corporation's tax is being determined as though they had invested substantially less, and it may be that the result is a hardship which Congress would not knowingly have imposed. But the statute is in our opinion clearly applicable and leaves no room for construction.

The petitioner returned as income a proportionate part of the amount received from the purchaser of the *Hercules* in 1920. From the facts disclosed this appears to be error. When the petitioner acquired the vessel or an interest in it, it paid its value and was charged with the knowledge of its sale and the incidental rights affected. The cost to petitioner was on the basis of a value for the whole vessel of $300,000. It made no profit when in 1920 it received no more than this. How this view may affect the treatment of the old corporation in respect of the sale we need not consider.

The petitioner seeks amortization of its tugboats. No claim therefor was made before June 15, 1924, and its right therefore, if any it had, has lapsed and has not been revived by section 1209, Revenue Act of 1926.

Upon the issues raised we sustain the Commissioner as to the computation of invested capital and amortization, and the petitioner as to the amount received for the *Hercules*.

> *Judgment will be entered accordingly after 10 days' notice, under Rule 50.*